JOHN SEELEY WALLACE

*v.*

CYTHERA M. RAPPLEYE et al.*

Mr. JUSTICE DICKEY, also dissenting:

This case has been passed upon twice by this court. In September, 1881, the decree of the Superior Court of Cook county was affirmed. On rehearing, granted upon petition of appellant, and upon further consideration, the present result is reached.

In affirming the decree on the first hearing, this court, speaking by Mr. JUSTICE MULKEY, said:

"The controverted questions presented for our determination by the present record, arise upon the cross-bill of Mrs. Rappleye, and the answer thereto of John Seeley Wallace. The cross-bill is in the nature of a bill for the specific performance of the alleged contract between John Seeley Wallace, deceased, and Jane Slover, the mother of Mrs. Rappleye. A number of objections to the propriety of the decree of the court below are urged with much earnestness and marked ability, and while it is conceded the case is not free from difficulty, yet, upon a very careful consideration of it, we are of opinion that the decree is warranted by the law and the evidence.

"In the first place, it is claimed that the agreement between Wallace and Jane Slover has not been clearly and satisfactorily proven. If this objection is justified by the facts appearing of record, it is certainly fatal to the decree, for it is a well recognized principle of the law of specific performance that courts of equity will not decree the specific performance of an alleged contract where there is a reason-

---

* The principal opinion in this case will be found in this volume, *ante*, p. 229. This dissenting opinion by Mr. JUSTICE DICKEY was omitted from its proper place at the close of the case on page 262.

able doubt as to the existence of such contract,—or, in other words, where it has not been clearly and satisfactorily established. If the proof of the present contract consisted alone of the testimony of Jane Slover, the difficulty in sustaining the decree would be much greater than it is; yet even her testimony, when considered in the light of surrounding circumstances, and the very rigid and exhaustive cross-examination to which she was subjected, has much inherent force in it. In passing upon her testimony, it must be remembered that she is evidently a woman of no culture, and has lived in comparative poverty and obscurity all her life, and it is not therefore to be expected that she would acquit herself upon the witness stand, under the pressure of a searching cross-examination, especially upon unimportant incidents connected with the affair which did not impress themselves upon her memory, with the same degree that she probably would if her opportunities in life had been better. Upon the vital question of the agreement and its terms, although required to repeat them often through her long and skillful examination, she is consistent with herself throughout. Counsel even object to her testimony on the ground that she can not be moved from her position upon the vital point in the agreement, namely, that her child was to be adopted and made the heir of Wallace, while she fails to sustain herself so well on less important matters. We do not think the conclusion is just. It is not reasonable to suppose that she would remember mere collateral details and conversations between herself and Wallace, that did not directly affect the well-being of her child. On the other hand, no lapse of time would probably ever efface from her memory the substance of the terms upon which she surrendered forever all right and claim to it. According to her statement, the terms of the agreement are few, pointed, and of marked significance. That the child was given to Wallace upon some kind of an understanding between them, can not, in the light of the

admitted circumstances, be doubted, and there is no evidence in the record tending to establish any other agreement than that testified to by her; and since she is strongly corroborated by other witnesses and all the circumstances in the case, we must accept her statement of it as true. It contains, as just remarked, but a few plain, pointed provisions,—just such as an uneducated, simple, confiding young mother under such circumstances could never forget. She was to give Wallace her child and abandon it forever, and he was to take it to his home and raise and educate it as his own child—adopt it and make it his heir. There was no misunderstanding or forgetting of these terms by either of the parties. The lives and subsequent conduct of both the contracting parties demonstrated this beyond all controversy. The agreement was faithfully executed on the part of the mother and the child, and with equally good faith was honestly attempted to be carried out by Wallace in his lifetime, and by his daughter, Frank, since his decease, whose noble and generous conduct in the affair challenges the highest admiration; and the question simply remains, whether the undoubted objects and purposes of both parties to the agreement shall be carried out in good faith, or be defeated.

"It is also urged that the agreement is not sufficiently specific to warrant a court of equity in decreeing its execution. We do not think so. The agreement on the part of Wallace, as we have just seen, was to adopt the child and make it his heir. That meant something more than to merely confer on it the capacity of inheriting his estate. That alone might or might not be of any practical benefit, depending upon whether or not he made a will, and if so, the character of its dispositions. What was really intended and obviously understood by the parties was, that Wallace was to adopt such legal measures as would secure to the child the same interest in his estate as she would, on his dying intestate, succeed to if a legitimate child. If, as is claimed,

there was no law at that time by which Wallace could confer upon her the capacity of inheriting his estate upon his intestacy, to give the contract any force at all it must be construed as an undertaking on his part to secure to her by deed, will, or some other appropriate means, so much of his estate, subject to distribution at the time of his death, as she would have been entitled to, if a legitimate child, upon his dying intestate; for it is manifest, to give it the construction contended for would render it inoperative altogether. This we are not prepared to do.

"It is also contended that there is no sufficient consideration to support the agreement in question. We think otherwise. The liability of Wallace to support the child, and the surrender of its custody on the part of the mother, at his request, afford a sufficient consideration for the undertaking on his part; and that a contract of this character is valid and binding, is fully sustained by the following authorities: *Allen* v. *Dawson*, 16 Ind. 417; *Hook* v. *Pratt*, 78 N. Y. 376; *Ridley* v. *Ridley*, 11 Jur. N. S. 475; *Alderson* v. *Maddison*, 5 Exch. 293; *Taudus* v. *Ansley*, 4 Ves. 501; *Hammersley* v. *DeBeel*, 12 Cl. & Fin. 45; *Prole* v. *Soady*, 2 Giff. 1; *Johnson* v. *Hubbell*, 10 R. I. 335; *Wright* v. *Tinsley*, 30 Mo. 396.

"The enforcement of the agreement is also resisted, on the ground that it is not in writing, and therefore falls within the Statute of Frauds. Conceding the contract, when originally made, was obnoxious to this objection, yet we are of opinion that, inasmuch as it has been fully performed on one side, it would be a fraud upon complainant to permit that objection to prevail now. The evidence shows there has been such a performance of the contract as to take it out of the operation of the statute; hence it is unnecessary to inquire whether the contract, as originally made, was within the statute or not. *Gupton* v. *Gupton*, 47 Mo. 40; *Van Dyne* v. *Vreeland*, 11 N. J. Eq. 371.

"Finally, the agreement between Wallace and his divorced wife is relied on as a defence to the relief sought upon this cross-bill. If the contract relied on in the cross-bill is valid, as we have seen, it is difficult to perceive how Mrs. Rappleye's rights can be affected by the subsequent contract with Mrs. Celia W. Wallace. Viewed from appellant's own standpoint, the most that can reasonably be claimed is, that the equities of himself and Mrs. Rappleye are equal, and if so, the latter's, being first in time, should prevail. But we are unable to see anything in that agreement that is in conflict with her rights. The manifest object of it was to bind Wallace not to discriminate against his son in the distribution of his property by devising it to his other child or children. The agreement evidently was not intended to affect interests in his estate that had already been legally conferred on another."

I approve so heartily of what was then, as I think, so aptly said, that I adopt the words as my own.

I wish, also, to say, that it now does not seem to me that the fact that Mrs. Matthews got the impression in November, 1879, that the paper presented to her by Rappleye at that time had been brought by him from Chicago, when in truth it was prepared by Rappleye at Fort Scott, after he had, in conversation with her, found what she did remember, has the slightest bearing against the accuracy of her memory of the events of her early days. The experience of every person of mature years teaches the universal truth that the events of early life are preserved in the memory far more accurately and more vividly than intervening events of a much later date. This remark is equally applicable to the matter of the memory of the witness Van Auken. Nor do I see any substantial difference between the effect of the testimony of that witness without prompting, and that called out by the leading question which followed. Were the words used in a pleading,

a difference might well be alleged; but when an unlettered witness said, of Wallace: "He said he agreed to take the child and bring it up as his own, to educate and treat it as his own child, and he wanted it as heir to his property,— that is, the only heir he had," etc.,—does not this language carry the idea that the proposition "to make the child an heir" was a part of the agreement and arrangement made with its mother? It adds nothing in substance, then, for the witness to say, in addition, that he wished to be understood that Wallace "agreed with Jane that the child should be his heir." It is not the recollection of particular phrases, at the distance of thirty-five years, on which reliance is to be placed, but the recollection of the *substance* of what was said.

Keeping in view the uniform course of conduct by Wallace through a long course of years, his attempt to adopt the child, and his evident supposition that he had made the child his heir by adoption, it does not require very clear proof in addition thereto to convince the mind fully that he did agree to do so, and as an honest man he diligently tried to do so, and died under the belief that he had faithfully kept his contract. The circumstantial evidence that he did so promise to Jane, is, to my mind, very cogent. The consideration for the promise, which gives it force in my mind, was the promise of Jane that she would absolutely surrender the child, forbear to visit it, and so act that the child might successfully be held out as the legitimate child of Wallace. During all these years she faithfully kept that promise, notwithstanding the maternal yearnings prompting her to a different course of conduct. So faithfully was her part of this contract performed that the child never suspected she was other than a legitimate child of Wallace and his wife, until shortly before her marriage. There was no fraud in the contract, at the time when it was made, which could possibly affect the existing rights of any one; for the then

wife of Wallace was at that time made cognizant of the whole affair, acquiesced in the arrangement, and did her part toward carrying it into effect.

Nor do I see that the contract of April 10, 1872, made between Wallace and the mother of John Seeley Wallace, stands at all in the way of the just claim of Mrs. Rappleye. That contract was, that the property of the father's estate owned by him at his death, "shall be so divided that his son (the appellant) shall have the same share as he would take under the laws of Illinois were his father to die intestate." The father did die intestate, hence the rights of appellant are just what they would have been had no such contract been made. The contract of April 10, 1872, by its very terms, is to be operative only in case the father made a will. So much for the letter of that contract.

Departing from the letter, and seeking the meaning and intention of the parties, we find that at that time the illegitimacy of appellee was known only to very few. It does not appear to have been known to the mother of appellant. She did know that Mrs. Rappleye was recognized by every member of the family as one of the prospective heirs of the father. The substance of the contract was, that appellant should not be deprived of his right to inherit one-third of the estate by any will which his father might make.

The eminent justice of the claim asserted by Mrs. Rappleye is so palpable to my mind, and so well sustained by the facts, that I think the decree of the trial court ought to be affirmed.